OPINION
{¶ 1} Appellant, "D.O.," appeals from an order granting legal custody of two of her children, "J.O." and "D.P.," to the children's great-aunt and great-uncle.
 {¶ 2} On October 1, 1998, Franklin County Children Services ("FCCS") filed a complaint stating that J.O., who was one year old at the time, was a neglected and dependent child. The basis of the complaint was the continuing domestic violence between appellant and the children's father ("Father"). FCCS had had prior contact with this family, as an older child not part of this proceeding had been placed with a family member previously. On January 11, 1999, the trial court found J.O. to be a dependent child, placed J.O. under the protective supervision of FCCS, ordered Father to complete drug and alcohol and psychological assessments, and ordered both parents to attend domestic violence counseling.
 {¶ 3} Reports from FCCS reviews in March 1999, August 1999, and January 2000, noted that the parents were meeting the basic needs of J.O. and, after his birth in August 1999, D.P. They also noted, however, that the parents had failed to enroll in domestic violence counseling and that Father had not completed the drug and alcohol or psychological assessments. Father had been incarcerated from May to August 1999 for criminal damaging.
 {¶ 4} On June 1, 2000, the court found the parents in contempt of its January 11, 1999 order for their failure to comply with the order and the FCCS case plan. The court sentenced both parents to 30 days in jail, but suspended the sentence and ordered the parents to purge the contempt by attending the assessments and counseling previously ordered.
 {¶ 5} A November 2, 2000 report by FCCS found that the parents had not completed domestic violence counseling. An April 17, 2001 report also found that the parents had not yet completed counseling, Father had tested positive for marijuana, and had been charged with domestic violence against appellant, but the charge was dismissed after appellant recanted her story.
 {¶ 6} Following a hearing on July 13, 2001, the court ordered J.O. into immediate temporary custody of FCCS. And, although our record does not contain an applicable judgment entry, the record contains evidence that the court ordered D.P. into the temporary custody of FCCS on July 17, 2001. The court subsequently adopted a case plan applicable to both children.
 {¶ 7} A September 14, 2001 report by FCCS found that both parents had begun domestic violence counseling and that Father had tested positive for marijuana and had been charged with possession of cocaine. The report also noted that the parents had failed to turn the children over to FCCS on the appropriate day after the July order. Finally, the report noted aggressive behavior by the children while in foster care and their difficulty adjusting to a structured environment.
 {¶ 8} On December 20, 2001, FCCS filed a complaint for temporary custody of D.P. The complaint stated:
* * * As to [D.P.], the history with Children Services is ongoing domestic violence, dirty home conditions, and lack of follow through by the parents with counseling, substance abuse assessments, and recommendations to follow through with psychological examinations. The parents have failed to complete their case plan and continue to place the child at risk by means of their lack of follow through. * * *
 {¶ 9} A February 4, 2002 review found minimal progress. Appellant had received emergency medical care following an altercation with Father. The report also noted that both parents participated well in class, but were not able to transfer knowledge to their daily functioning. Finally, the report noted the continued aggressive behavior by the children, particularly toward one another.
 {¶ 10} On March 12, 2002, a magistrate issued a decision, which the trial court approved and filed on April 22, 2002, finding D.P. to be a dependent child and granting temporary custody of D.P. to FCCS.
 {¶ 11} A July 9, 2002 review noted that the parents had each completed a psychological evaluation, as ordered. Appellant had tested positive for cocaine in February 2002. The reviewer also noted a recurrent finding that the parents are unable to place limits on the children during their visitation sessions.
 {¶ 12} On July 22, 2002, FCCS moved to extend temporary custody of J.O. In its motion, FCCS stated:
Mother, [D.O.], has not yet completed her court-ordered case plan. Although she has completed domestic violence classes through C.H.O.I.C.E.S., she has declined individual counseling for domestic violence issues as recommended by the court-ordered psychological evaluation and case plan. Mother has completed a drug/alcohol assessment. However, she failed to complete drug/alcohol treatment as recommended by her assessment. Further, Mother does not consistently provide urine screens as requested by the Children Services caseworker, and did test positive for cocaine on 2/7/02.
Father, [name deleted], has not yet completed his court-ordered case plan. Father did complete domestic violence classes at Southeast Mental Health, but he failed to follow through with individual counseling as recommended. Father has not completed a drug/alcohol assessment as required by the case plan, nor has he consistently provided drug/alcohol screens to the Children Services caseworker. Father did test positive for marijuana on 8/13/01, and cocaine on 11/8/01. Father was charged with domestic violence against Mother in May of 2002.
Children Services is requesting an extension of temporary custody as Mother and Father have thus far failed to complete critical elements of the case plan, and [J.O.] cannot at this time be returned to their care. Further, Father's current domestic violence charges preclude a return of custody at this time. Children Services has reasonable cause to believe that [J.O.] can be reunified or otherwise permanently placed within the proposed extension period.
The court granted the extension.
 {¶ 13} A December 3, 2002 review by FCCS noted increased aggressive behavior by D.P., noting that the children continue to act aggressively toward one another. The report stated that appellant had completed drug and alcohol treatment and had started to attend counseling, and Father had completed domestic violence counseling and had been attending drug and alcohol counseling. Appellant had completed one of eight drug screens; Father had not completed any of his six screens.
 {¶ 14} On December 16, 2002, FCCS moved to extend temporary custody of D.P. The motion stated:
Mother, [name deleted] has not yet completed her court-ordered case plan. She has completed domestic violence classes through C.H.O.I.C.E.S., and has just started counseling for domestic violence issues as recommended by the court-ordered psychological evaluation and case plan. Mother has completed a drug/alcohol assessment. Mother does not consistently provide urine screens as requested by the Children Services caseworker.
Father, [name deleted] has not yet completed his court-ordered case plan. Father did complete domestic violence classes at Southeast Mental Health, as well as a drug/alcohol assessment. Father has just recently started counseling. Thus far, Father has failed to provide random drug screens to the Children Services caseworker. Father has several pending criminal charges, including felony domestic violence, felony possession, and public indecency.
Children Services is requesting an extension of temporary custody as Mother and Father have thus far failed to complete the case plan, and [D.P.] cannot at this time be returned to their care. Further, Father's current domestic violence charges preclude a return of custody at this time. Children Services has reasonable cause to believe that [D.P.] can be reunified or otherwise permanently placed within the proposed extension period.
 {¶ 15} The record does not contain evidence that the court granted the extension. However, there are multiple requests by the parents for continuances during this time period.
 {¶ 16} On March 18, 2003, in separate actions, FCCS moved for permanent custody of J.O. and D.P. Attached to each motion was the affidavit of an FCCS case worker, who stated that appellant had completed parenting classes, drug and alcohol assessment and treatment, and domestic violence counseling, but had failed to complete all drug screens, to obtain and maintain stable housing, and to attend individual counseling. "Mother suffers from a mental health illness/chemical dependency issue (Cannabis Abuse, Cocaine Abuse, Mixed Borderline Disorder, Paranoid Personality Disorder and Borderline Intellectual Functioning) so severe it makes her unable to provide an adequate stable home for the child at the present time" or within one year of a permanent custody hearing. Finally, the affidavit noted that appellant had an active warrant for her arrest relating to a civil lawsuit. As for Father, the affidavit stated that he had failed to complete case plan objectives. Although he had attended classes and counseling, he had tested positive for drug use, had failed to complete all drug screens, and had failed to attend individual counseling. "Father suffers from a mental health illness/chemical dependency issue (Alcohol Abuse, Mixed Avoidant, Depressive, and Antisocial Personality Disorder and Borderline Intellectual Functioning) so severe it makes him unable to provide an adequate stable home for the child at the present time" or within one year of a permanent custody hearing. Finally, the affidavit noted Father's extensive criminal history and three active warrants for his arrest.
 {¶ 17} On April 3, 2003, the children's paternal grandmother moved to join the action and requested legal custody of the children.
 {¶ 18} A May 6, 2003 FCCS review noted a recurrent problem with appellant bringing sweets and junk foods to the visitation sessions and to the children's school. The report also noted that appellant and Father had each had a positive drug screen. Appellant reported that Father had hit her and gave her a black eye, and that Father has been selling cocaine. Appellant also reported that Father had moved into his own apartment, but still had belongings at appellant's home. Appellant had also been charged with receiving stolen property.
 {¶ 19} On May 23, 2003, the children's paternal aunt moved to join the action and obtain custody of the children. The aunt already had custody of the children's younger sibling, who is not part of this appeal. The aunt sought custody in order to keep the three children together.
 {¶ 20} On July 17, 2003, FCCS requested a continuance of the permanent custody proceeding in order to allow time to conduct a home study of relatives in Arizona. The court granted the continuance, noting that a home study on the grandmother also was being conducted. And, on September 4, 2003, the children's maternal great-aunt ("Annette"), who lives in Arizona, moved to join the action and obtain custody of J.O. and D.P.
 {¶ 21} An October 9, 2003 review noted that neither parent had made any progress on the case plan. The children had visited with Annette and her husband ("Kirk"), both here and in Arizona, and FCCS was awaiting documentation regarding interstate approval.
 {¶ 22} A March 9, 2004 FCCS review noted that the children had been living with Annette and Kirk in Phoenix, Arizona since November 21, 2003. J.O. was attending kindergarten, and D.P. was in preschool. The report noted that appellant had "kidnapped" the children during a visitation session on October 21, 2003, taking them out of the county for a week until FCCS located her. Appellant was charged with two counts of interference of custody. The report noted that appellant was currently incarcerated for a probation violation, but was on daytime work release. The report also noted that Father was serving a one-year sentence in Pickaway County for drug and domestic violence charges and also had three other charges pending against him in Franklin County.
 {¶ 23} On March 16, 2004, FCCS moved the court for an alternative disposition, i.e., award of legal custody to Annette and Kirk.
 {¶ 24} On April 5, 2004, the trial court appointed counsel for the children, noting "GAL conflict."
 {¶ 25} On May 26, 27, and 28, 2004, and on June 1, 2004, a magistrate held a hearing on the motions for custody and an alternate disposition. Appellant and Father were each represented by counsel, and separate counsel represented the children.
 {¶ 26} On the first day of the hearing, FCCS withdrew the motion for permanent custody and proceeded instead on the motion for legal custody being awarded to Annette and Kirk.
 {¶ 27} FCCS called Annette as the first witness. Annette testified to the children's daily routine, school arrangements, and family relationships. She stated that appellant called the children about once a week when they first went to live in Arizona and then about once every couple of weeks in the preceding three to four months. Appellant's phone number was programmed into the family's cell phone, as was the number for the children's grandmother. She stated, however, that the children had never asked to call appellant. She also testified that the children were in counseling. J.O. was on medication for hyperactivity, but was doing very well in school.
 {¶ 28} On cross-examination, Annette testified regarding behavioral issues, which primarily involve fighting between them and J.O.'s attempts to "mother" D.P. (May 26, 2004 "Vol. I" Tr. at 32.) She also testified that they are "wonderful kids" who are "very loving[.]" (Vol. I Tr. at 38.) She testified that she was aware that the children had each expressed a desire to be reunited with their mother. She also testified that the children "tell us all the time they want to stay with us." (Vol. I Tr. at 39.) The children have sent letters to appellant and Father, and Annette has sent pictures. And family members send cards and gifts to the children. Finally, Annette testified that, when appellant was without a job, she gave J.O. a birthday gift from appellant "because [Annette] did not want [J.O.'s] heart to be broken thinking her mother didn't send anything for her birthday." (Vol. I Tr. at 43.)
 {¶ 29} Appellant also testified. She stated that she talks with the children once or twice per week or once every other week, depending on whether she is working or not. She testified that she had had two positive drug screens, but had not used illegal drugs in three years. In her view, the positive tests resulted from her cleaning up cocaine Father had left in the home. She stated that she had completed drug and alcohol treatment, parenting classes, and domestic violence counseling. She stated that her relationship with Father had ended a year before. She had been in jail briefly for "RSP[,]" was released on probation, and then violated probation. (May 27, 2004 "Vol. II" Tr. at 16.) As a term of her probation, she testified, she was to get her "GED[.]" (Vol. II Tr. at 17.)
 {¶ 30} As to her visits with the children while they were in foster care, appellant described the children as well-behaved and stated that she had no trouble controlling them. She described her relationship with the children as "[v]ery, very close." (Vol. II Tr. at 22.)
 {¶ 31} If the children were returned to her, appellant testified, she had adequate and ready living arrangements, the children would attend Dublin schools, and the school district would provide transportation. She also stated that she has family support in the area, and that she is employed. When asked her thoughts about the best interests of the children, appellant stated:
A. I think the best interest of the children would be to come home —
Q. And why —
A. — where they want to be.
Q. Okay. And why is that?
A. Because I love them and I would do anything for them and they know that. And they love me.
(Vol. II Tr. at 28.)
 {¶ 32} When asked to explain why the children do not call her, appellant stated: "Because they was in foster home for two and a half years and not able to. So they're not used to being able to say, `hey, can I call my mom?'" (Vol. II Tr. at 28.) She testified that she had not visited the children in Arizona because she could not afford it.
 {¶ 33} Appellant described the children's demeanor during visits while they were in foster care as very happy. "There was joy." (Vol. II Tr. at 32.) "We read, we played, we play games; we read books." (Vol. II Tr. at 32.) At the end of the visits, appellant testified, the children wanted to go home with her. As to whether the children wish to live with her now, appellant stated: "They want to come home really bad and my daughter says to me that she wishes she could blink and wake up to be with me." (Vol. II Tr. at 35.) She described their behavior toward one another as normal sibling rivalry and said that the children did not argue frequently while at home with her and did not fight with one another during visitation while in foster care.
 {¶ 34} She described the significant family support she has in the Columbus area and said that her family had expressed a willingness to help her care for the children. Throughout her testimony, appellant described incidents of violence by Father, including one incident involving children. But she also testified that she would not allow Father to move back into her home if the children were returned to her. Asked whether she had had a telephone conversation with the children in Arizona while Father was also on the call, she admitted that she had, but denied having a direct conversation with him. Appellant also described her erratic work history and work hours, which impacted the children, but also testified that, since that time, she had taken parenting classes. When asked why she had lost custody of all four of her children, appellant blamed the FCCS caseworker.
 {¶ 35} The FCCS caseworker, Ms. Russell, then testified. She described the family's history with FCCS. She stated that the basis for FCCS's involvement regarding D.O. and J.P. was domestic violence issues between Father and appellant, and between Father and his mother, as well as poor living conditions. She stated that appellant had completed domestic violence counseling, drug and alcohol treatment, and parenting classes. Appellant had completed only 11 of 44 required urine screens.
 {¶ 36} As for visitation while the children were in foster care, Ms. Russell testified that the parents did not supervise the children appropriately. She also described instances of the parents bringing inappropriate amounts and types of food for the children at the visitations and at school. She stated that the children were excited to see their mother at the visitations. When the children were first removed, they had difficulty leaving their mother, but, as time went on, they had less difficulty. Appellant attended most of the FCCS case plan reviews.
 {¶ 37} Ms. Russell confirmed that appellant had completed a parenting class, but testified that the parents did not implement any of the learned information or skills from the class. She also testified that appellant had completed domestic violence counseling, but had not shown changes in her relationship with Father.
 {¶ 38} Ms. Russell testified that reunification was FCCS's goal. She was aware throughout her contact with the children that they wanted to be with their mother. On cross-examination, counsel pointed out that appellant had attended domestic violence classes, had ended her relationship with Father, reported an incident of violence to the police, and was assisting in his prosecution. When asked what more appellant could do, Ms. Russell stated:
A. Well, that's good that she did [do] those things. Those are appropriate things to do in that situation. The Agency's concern is the longevity of this case and the fact that it's been ongoing domestic violence ever since 1996 that the Agency's aware of.
[Mr. Frost] Q. Oh, I'm not disputing the fact that in '96 there was a DV relationship. I guess what I'm trying to go to is you want her to deal with the DV; she's done the classes. She seems to have gotten away from him, you know, she's calling the police, she's reporting it, she's prosecuting, what more can she do at this point?
A. Well, but she has gotten away from him in the past and they've gotten back together. There have been times in the past where she's moved out and found out that he had actually paid for her rent where had moved into leaving the Agency to believe that they weren't together.
Q. And that's been since she's taken DV classes that's happened?
A. I think that was beforehand.
(May 28, 2004 "Vol. III" Tr. at 62-63.)
 {¶ 39} On re-cross, Ms. Russell stated further that appellant would need to stay out of a relationship with Father and would benefit from individual counseling. Following Ms. Russell's testimony, FCCS rested.
 {¶ 40} Appellant called a friend, "Beth," as her first witness. Beth testified that she interacted with appellant frequently, and that appellant cared for Beth's child, as well as other children. Beth described appellant as a "very good mother" who kept a clean house and interacted appropriately with children. (June 1, 2004 "Vol. IV" Tr. at 12.)
 {¶ 41} Appellant also testified again. She described the multiple classes and counseling she had attended, what she had learned from them, and how she had implemented the learned behaviors in her life. In appellant's view, Father's behavior was the reason for the children's removal, and he had been removed as a problem. Testimony also focused on her interaction with FCCS and FCCS's failure to visit her current home. Appellant recalled one incident when she brought the children Easter baskets, and Ms. Russell took them away from the children. Appellant stated that Ms. Russell criticized her gift-giving, but that appellant was merely giving her children what she had not received as a child. As for Ms. Russell's personal observation of appellant's visits with the children, appellant testified that Ms. Russell observed their interaction for about five minutes every three weeks. Finally, appellant confirmed that she would not allow Father back into her life and would move, if necessary.
 {¶ 42} A great deal of testimony related to appellant's employment and income, apparently to demonstrate that she earned enough to meet her monthly living expenses and could care for her children. Although appellant could not recall her 2003 total income, she testified that she earns enough to meet her expenses and has a little left over.
 {¶ 43} Finally, testimony from various witnesses concerned Father's criminal record and current incarceration. No one witness seemed to have first-hand knowledge about why he was incarcerated at the time of the hearing.
 {¶ 44} At closing, the guardian ad litem stated to the court that, in his opinion, it was in the best interest of the children to grant legal custody to Annette and Kirk. In support of that position, he noted appellant's positive drug tests, financial instability, and lack of parenting skills. He acknowledged the children's desires to be with their mother, but noted: "These kids are four and seven, that's pretty young to be making * * * life altering decisions[.]" (Vol. IV Tr. at 118.)
 {¶ 45} Immediately following closing arguments, the magistrate recommended an award of legal custody to Annette and Kirk. The magistrate acknowledged the children's desires to return to their mother, but concluded that a return home would not be in their best interest. In his view, appellant's credibility was at issue, specifically as it related to her relationship with Father, the positive drug tests, her cooperation on the domestic violence charges, and her ability to meet her monthly finances. He also found the placement with Annette and Kirk to be "ideal" and a "godsend for these kids." (Vol. IV Tr. at 122.) On these grounds, the magistrate recommended granting FCCS's motion for alternate disposition and dismissing all other pending motions.
 {¶ 46} The magistrate's decision recommending legal custody be awarded to Annette and Kirk was filed on June 10, 2004. On June 14, 2004, appellant filed objections to that decision. As subsequently amended, appellant objected on the grounds that the magistrate admitted hearsay testimony and the magistrate's decision was against the manifest weight of the evidence. Father also objected on manifest weight grounds. After the transcript was filed, on October 18, 2004, appellant and Father filed joint objections, assigning the following as error: the decision is adverse to the weight of the evidence; the decision conflicts with existing case law.
 {¶ 47} The trial court held an objections hearing on October 26, 2004. On January 5, 2005, the court issued its decisions in the separate cases involving J.O. and D.P., and, in both cases, overruled the objections to the magistrate's decision. The court acknowledged that appellant had completed several aspects of the case plan, but concluded that many issues remained. Noting appellant's testimony that she had not had contact with Father in the year preceding the hearing, the court questioned whether the limited contact was the result of Father's incarceration, rather than a decision by appellant to avoid him.
 {¶ 48} As to each child, in the court's view, Annette and Kirk are better able to provide a stable and safe environment. Acknowledging the children's desire to be with appellant, the court concluded that it is in their best interest to remain in Arizona. The court also stated:
* * * Contrary to the assertions of counsel, [appellant's] parental rights have not been effectively terminated by the award of legal custody. Despite the great distance between Ohio and Arizona, [Annette and Kirk] support J.O.'s ability to maintain contact with her mother and relatives here. Even though the Magistrate did not order a specific visitation schedule, [appellant's] residual rights are still intact. She may visit and contact J.O. as often as she would like and is able.
The court made a similar statement as to D.P. in the written decision in his case.
 {¶ 49} The court found no support for appellant's objections concerning hearsay. And the court concluded that the decision did not conflict with current case law, which requires disposition based on the best interest of the child. On these grounds, the court overruled the objections and entered judgment, which granted legal custody to Annette and Kirk.
 {¶ 50} On February 4, 2005, appellant filed notices of appeal to this court. In these consolidated appeals, appellant presents the following assignments of error:
I. The trial court erred in applying the incorrect legal standard in its decision awarding custody of the minor children to a non-parent.
II. The decision of the trial court awarding custody was against the manifest weight of the evidence.
 {¶ 51} As noted above, J.O. and D.P. were adjudicated dependent (J.O. in 1999; D.P. in 2002). Once a child is adjudicated abused, neglected or dependent, a juvenile court may award legal custody of the child to any parent or person who files a motion requesting legal custody. R.C.2151.353(A)(3). In determining whether to grant legal custody to the parent or movant, the court must comply with R.C. 2151.42, which requires the court to consider the best interest of the child in making the custody determination. R.C. 2151.42(A).
 {¶ 52} On appeal, we will not reverse an award of legal custody absent an abuse of discretion. In re Gales, Franklin App. No. 03AP-445,2003-Ohio-6309; In re Nice (2001), 141 Ohio App.3d 445, 455. Abuse of discretion connotes more than an error of law or judgment. Rather, it implies that the trial court's decision was unreasonable, arbitrary or unconscionable. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219. "`[L]egal custody where parental rights are not terminated is not as drastic a remedy as permanent custody.'" In re A.W.-G., Butler App. No. CA2003-04-099, 2004-Ohio-2298, at ¶ 7, quoting Nice at 455. Therefore, the trial court's standard of review in legal custody proceedings is not clear and convincing evidence, as it is in permanent custody proceedings, but is merely preponderance of the evidence. Nice at 455; Inre A.W.-G; In re Law, Tuscarawas App. No. 2003 AP 06 45, 2004-Ohio-117. "Preponderance of the evidence" means "evidence that's more probable, more persuasive or of greater probative value." State v. Finkes (Mar. 28, 2002), Franklin App. No. 01AP-310. See, also, In re A.W.-G. at fn. 1.
 {¶ 53} In her first assignment of error, appellant argues that the trial court was required to make a finding of parental unfitness before granting custody of the children to a non-parent. We disagree. In In reTrowbridge, Franklin App. No. 03AP-405, 2004-Ohio-2465, this court held that, where a dependency determination has already occurred, the court need only determine the best interest of the child. The court, inTrowbridge at ¶ 14, stated: "Accordingly, when there has been a dependency determination there has already been to some degree a finding of parental unsuitability and a juvenile court is not required to make another, separate finding of parental unsuitability when determining a dependent child's disposition." Accord Gales.
 {¶ 54} Despite our holdings in Trowbridge and Gales, appellant relies on In re Perales (1977), 52 Ohio St.2d 89, to argue that, in a custody dispute between a parent and a non-parent, the court cannot make a best interest determination without first making a finding of parental unfitness. However, Perales did not arise from an abuse, neglect or dependency adjudication. As this court noted in Trowbridge at ¶ 15, "several other appellate courts have distinguished Perales as we have here and have held that a juvenile court need not make a separate finding of parental unsuitability once a child is adjudicated an abused, neglected, or dependent child." See, also, In re Allah, Hamilton App. No. C-040239, 2005-Ohio-1182; In re T.W., Summit App. No. 21594,2003-Ohio-7185. Here, because J.O. and D.P. had already been adjudicated dependent, the court properly limited its determination to the best interest of the children. Thus, based on Trowbridge, we overrule appellant's first assignment of error.
 {¶ 55} In her second assignment of error, appellant argues that it is in the best interest of the children to be returned to their mother and the court's contrary decision is against the manifest weight of the evidence. As to our review of a trial court's decision on a manifest weight of the evidence basis, this court has stated:
* * * When reviewing a trial court's decision on a manifest weight of the evidence basis, we are guided by the presumption that the findings of the trial court were correct. * * * The weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact. * * * The rationale for this presumption is that the trial court is in the best position to evaluate the evidence by viewing witnesses and observing their demeanor, voice inflections, and gestures. * * * Thus, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence. * * *
Gales at ¶ 11.
 {¶ 56} In support of her argument that the children should be returned to her, appellant points to the children's desire to be with her, her faithful visitation while the children were in foster care, her financial inability to travel to Arizona to visit the children, the close bond between her and the children, her current stability, including her housing and employment, and her severance of any relationship with Father. In support of the trial court's finding that Annette and Kirk should have legal custody, FCCS points to appellant's positive drug screens, her completion of only 11 out of 44 drug screens, her lack of parenting skills even after taking parenting classes, her persistent contact with Father, her failure to complete individual domestic violence counseling, and the children's current well-being and happiness. While FCCS and appellee CASA/Guardian ad Litem acknowledge the children's expressed desire to be with appellant, they note the young age of the children, the children's conflicting expression of desiring to stay in Arizona, and Annette and Kirk's efforts to maintain contact between the children and appellant. Taking all of this evidence into consideration, we find that the trial court's decision was not against the manifest weight of the evidence.
 {¶ 57} First, appellant's love for her children, her desire to maintain a maternal bond with them, and her desire to provide for them to the best of her ability, are apparent from the record in this case. While appellees criticize appellant for not calling the children often enough and for not visiting them in Arizona, it is clear that appellant has attempted to maintain a bond with the children throughout their lives. Nevertheless, Ohio law requires us (and required the trial court) to determine what is in the best interest of the children. From this vantage point, we can readily conclude that it is in the children's best interest to remain in Arizona.
 {¶ 58} While living with appellant, the children were exposed to domestic violence. Even after the violence formed the basis for FCCS involvement with the family, and even though the court ordered appellant to attend domestic violence counseling, appellant refused for more than two years to complete counseling and continued her relationship with Father. We do not wish to minimize the enormous difficulties victims of domestic violence must overcome in order to escape the abuse. But neither can we minimize the danger the children faced while in proximity to the violence. Whether appellant was unable or unwilling to address the risks to her children, they were not safe with her.
 {¶ 59} As to this abusive relationship with Father, appellant argues that she had severed her relationship with Father a year before the hearing. Commendably, appellant ultimately completed the domestic violence group counseling, called the police during a violent incident with Father, and cooperated with authorities in his prosecution. Evidence also revealed, however, that, even after being ordered to avoid contact with Father, appellant spoke on the phone with the children while Father was on the line. Evidence also revealed that appellant had once claimed to have severed her ties to Father, but FCCS later learned that Father was paying her rent. In the end, the trial court questioned whether appellant's lack of contact with Father was the result of his incarceration, rather than her affirmative actions.
 {¶ 60} While living with appellant, the children lived in an unstable environment. Most of the FCCS reports note that the children's basic needs were being met. However, evidence at the hearing revealed that appellant could not control the children and did not make good parenting choices for them. And, although appellant testified that she was employed and could pay her monthly expenses, the testimony revealed her persistent employment instability, due in part to her incarceration, and raised questions about appellant's ability to meet her financial obligations on her own.
 {¶ 61} Finally, appellant did not complete those parts of the case plan addressing drug and alcohol abuse. Appellant completed only 11 of 44 drug screens, and of those 11, two were positive for cocaine. Although appellant stated that one of the positive tests resulted from her touching cocaine, not ingesting it, the magistrate found that her explanation was not credible.
 {¶ 62} In contrast to their prior life with appellant and in two different foster homes, the evidence showed that J.O. and D.P. are thriving under the care of Annette and Kirk. The children's daily routine, living arrangements, and family relationships are stable, and they are in a loving and supportive environment. We acknowledge, as the trial court did, the children's expressed desire to be with appellant. We note, too, however, Annette's testimony that the children also expressed a desire to remain with her. While the children are not close geographically to appellant or other extended family members, Annette and Kirk have in no way restricted appellant's access to the children. In fact, they have taken steps to encourage and facilitate contact with appellant and other family members, and even to maintain the mother-child bond between appellant and the children. In light of this evidence, the trial court properly determined, despite the expressed desire of the children to be with appellant, that it is in their best interest to remain with Annette and Kirk.
 {¶ 63} For all of these reasons, we conclude that the trial court's award of legal custody to Annette and Kirk was not against the manifest weight of the evidence, and we overrule appellant's second assignment of error.
 {¶ 64} On these grounds, we overrule appellant's assignments of error, and we affirm the judgments of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.
Judgments affirmed.
McGrath and Christley, JJ., concur.
Christley, J., retired of the Eleventh Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.